UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

TROY PHILLIPS,                          )
                                        )
        Plaintiff,                      )
                                        )
        v.                              )          Case No. 1:18-cv-00752
                                        )
ORLEANS COUNTY, CHARLES NESBITT, JR.    )
in his individual capacity, GERALD GRAY in )
his individual capacity, DANIEL DONOHUE in his )
official capacity as President of the Civil Service )
Employees Association Local 1000, and CIVIL )
SERVICE EMPLOYEES ASSOCIATION           )
LOCAL 1000, INC.,                       )
                                        )
        Defendants.                     )

**OPINION AND ORDER GRANTING PLAINTIFF'S MOTION TO AMEND HIS
COMPLAINT, DENYING COUNTY DEFENDANTS' MOTION TO DISMISS,
AND DENYING CSEA DEFENDANTS' MOTION TO DISMISS**
(Docs. 14, 15, & 19)

Plaintiff Troy Phillips brings this action against Defendants Orleans County, Charles Nesbitt, Jr., Gerald Gray, Daniel Donohue, and the Civil Service Employees Association Local 1000, Inc. ("CSEA Local 1000"), alleging discrimination based on race and age, as well as violations of 42 U.S.C. § 1981.

Pending before the court are a motion to dismiss filed by Defendants Orleans County and Mr. Nesbitt (collectively "County Defendants") (Doc. 14); a motion to dismiss filed by Defendants CSEA Local 1000 and Mr. Donohue (collectively "CSEA Defendants") (Doc. 15); and Plaintiff's motion for leave to file his Second Amended Complaint ("SAC") (Doc. 19). Plaintiff opposes dismissal. Defendants oppose the proposed amendments to the SAC on the grounds that they are futile and because Mr. Nesbitt and Mr. Gray are entitled to qualified immunity with regard to at least one of Plaintiff's claims.

Plaintiff is represented by Earl Thomas Hall, Esq. County Defendants are represented by Heather L. Dechert, Esq. and Michael P. McClaren, Esq. CSEA Defendants are represented by Leslie C. Perrin, Esq.

## I.  Procedural History.

Plaintiff filed a Complaint on July 9, 2018 and filed a First Amended Complaint on July 13, 2018. On August 30, 2018, Plaintiff moved for leave to file the SAC which alleges the following claims: Count I: racially hostile work environment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2000e-17, against Orleans County; Count II: disparate treatment on the basis of race in violation of Title VII against Orleans County; Count III: retaliation in violation of Title VII against Orleans County; Count IV: violation of 42 U.S.C. § 1981 against Mr. Donohue, in his official capacity, and CSEA Local 1000; Count V: violation of 42 U.S.C. § 1981 against Mr. Nesbitt and Mr. Gray, in their individual capacities, and Orleans County; and Count VI: violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621-634, against Orleans County. In the SAC, Plaintiff withdrew his previous claim against Mr. Nesbitt under 42 U.S.C. § 1983 and Title VII and replaced it with a claim against Mr. Nesbitt and Mr. Gray under 42 U.S.C. § 1981.

## II.  The SAC's Allegations.

Plaintiff is an African-American male, over forty years of age, residing in Albion, New York. From approximately September 2007 through January 2015, Plaintiff was employed by Orleans County. He was hired as a Custodian and was eventually transitioned to a Building Maintenance Worker position in the Highway Department of the Grounds and Maintenance Group, however, throughout his employment he allegedly performed the work of a Senior Maintenance Worker. Plaintiff was a member of CSEA Local 1000, a labor organization representing some of the employees of Orleans County.

Plaintiff alleges that he was subjected to a racially hostile environment for the majority of his employment with Orleans County. More specifically, he alleges that his co-workers made racist comments, such as calling him a "nigger[,]" and refused job assignments that they referred to as "niggers' work." (Doc. 19-3 at 10, ¶ 24.) In 2012,

2

Plaintiff reported this harassment to Building and Grounds Superintendent Gerald Gray, requesting that Mr. Gray intervene to prevent future occurrences of harassment. Mr. Gray did not make an effort to stop the harassment.

Between 2012 and 2014, the harassment allegedly increased in frequency and intensity. In 2014, Plaintiff's co-workers shared pictures of President Barack Obama's head affixed to a monkey's body while pointing and laughing at Plaintiff. Co-workers routinely objected to less desirable work assignments by claiming that they were "not niggers" and they did not do "nigger work." *Id.* at 11, ¶ 32. Those work assignments were often reassigned to Plaintiff. From 2012 to 2014, Plaintiff continued to report racial harassment to Mr. Gray and to his other supervisors, James Noreck and Michael Cliff, but these individuals did not make an effort to stop the harassment and continued to assign a disproportionate share of the "most difficult or unpleasant tasks" to Plaintiff. *Id.* at 17, ¶ 77. At an unspecified time, Plaintiff claims that CSEA Local 1000 threatened him with discipline if he implicated his co-workers in racial harassment allegations.

During the early summer months of 2014, Plaintiff reported the alleged harassment to County Chief Administrative Officer Charles Nesbitt, Jr. Plaintiff told Mr. Nesbitt that "the harassment was ongoing, that it had become routine and was carried out by his co-workers in the Building and Grounds Department, and that [Mr.] Gray, [Mr.] Noreck and [Mr.] Cliff had the dates and specifics of many of the individual incidents." *Id.* at 11, ¶ 36. Following Plaintiff's meeting with Mr. Nesbitt, Plaintiff and his co-workers attended a brief "diversity" meeting. *Id.* at 12, ¶ 38.

After the diversity meeting, Plaintiff's working conditions "became intolerable." *Id.* at 12, ¶ 39. Some of Plaintiff's Caucasian co-workers continued to use racial slurs such as "monkey" and "nigger" when referring to Plaintiff. *Id.* at 12, ¶ 41. Co-workers also made statements such as "careful or we will have to go to training again" when Plaintiff entered a room. *Id.* at 12, ¶ 40. At times, Plaintiff's tools and other equipment were removed from his tool storage area and his co-workers refused to speak with him or assist him in his daily tasks. Plaintiff's supervisors also refused to speak to him "except to give him terse[] work orders." *Id.* at 12, ¶ 46. When Plaintiff asked why members of

the management group were treating him in this manner, Mr. Gray responded that Plaintiff had "gone over our heads" by reporting racial harassment to Mr. Nesbitt and would now "pay the price." *Id.* at 13, ¶ 48.

On multiple occasions, one of Plaintiff's Caucasian co-workers, Matthew Herman, contacted Flo Tripi, CSEA Western Region President, to report that Plaintiff experienced racial harassment and to request that CSEA intervene. Notwithstanding this request, CSEA did not take any measures to stop the harassment, and thereafter Mr. Herman "became the victim of the County's and CSEA's retaliatory actions." *Id.* at 13, ¶ 51.[1]

In November 2014, Plaintiff approached Mr. Cliff at a local restaurant to ask him to intervene to stop the harassment. Plaintiff told Mr. Cliff that his co-workers called him a "nigger," referred to his work assignments as "nigger work[,]" and stole his tools. *Id.* at 14, ¶ 54. Mr. Cliff responded by stating, "[t]here is nothing that can be done." *Id.* at 14, ¶ 55. Mr. Cliff warned Plaintiff that his job security was in jeopardy as a result of his reports of racial discrimination and advised him to stop reporting it. Milton Scurry, a friend of Plaintiff's who had accompanied him to the restaurant, told Mr. Cliff that Orleans County had a legal obligation to stop the harassment. Mr. Cliff reiterated that nothing could be done and advised Plaintiff to ignore the harassment if he wanted to keep his job. After this meeting, Plaintiff alleges that he was continually surveilled.

Plaintiff was terminated on January 14, 2015. Orleans County stated that Plaintiff was discharged for violating work rules and insubordination, however, Plaintiff claims that he was discharged in retaliation for his complaints regarding the racially hostile work environment he experienced. Scott Dugan, a younger, Caucasian co-worker, received a short suspension based on "similar allegations resulting in Plaintiff's termination, with the sole exception that [P]laintiff allegedly cursed at [Mr.] Gray." *Id.* at 17, ¶ 78.

Plaintiff asserts that in the year prior to his discharge, he was formally recognized by Orleans County for his "exemplary work[.]" He was selected as "Employee of the Month" for the months of June 2013 and February 2014; nominated for "Employee of the

---

[1] Although CSEA and CSEA Local 1000 are apparently different institutions, Plaintiff uses these identifiers interchangeably.

Year" by the Chairman of the Orleans County Legislature in 2013; and awarded a "Certificate of Appreciation" for excellence in workmanship and dedication in February 2014. *Id.* at 15, ¶¶ 62-67.

After his termination, Plaintiff contacted Cindy Troy, then President of CSEA Local 1000. Plaintiff alleges he met with Ms. Troy in a broom closet for ten minutes or less during which he stated that he was terminated in retaliation for his complaints of racial discrimination and harassment. In response, Ms. Troy told Plaintiff that discrimination was not the basis for his discharge and stated that CSEA Local 1000 would not investigate whether his termination was retaliatory.

A few days later, Plaintiff and his partner, Peggy Thomas, met with Ms. Troy and another CSEA representative, Dean Adams, for less than thirty minutes. Ms. Troy and Mr. Adams allegedly refused to investigate Plaintiff's claim that his discharge was retaliatory and told Plaintiff that they would not commit to grieving or arbitrating his discharge. They advised Plaintiff that even if the claim was arbitrated, Plaintiff was unlikely to prevail. Ms. Troy and Mr. Adams offered Plaintiff approximately $10,000 in exchange for his resignation. Plaintiff stated that he had received information that CSEA was "authorized by the County to offer $17,500." *Id.* at 19, ¶ 94. Ms. Troy asked how Plaintiff had discovered this information, but Plaintiff refused to disclose his source. Ms. Troy and Mr. Adams then raised the offer to $17,500 and demanded an immediate response from Plaintiff. Plaintiff asked to consult with an attorney to evaluate the offer, but Ms. Troy refused and "threaten[ed] [P]laintiff with loss of representation by the CSEA." *Id.* at 19, ¶ 96.

Approximately three days later, Plaintiff met again with Ms. Troy for less than five minutes. Plaintiff again asked for time to speak with an attorney and was informed that if he spoke to an attorney, CSEA would no longer represent him. Ms. Troy presented Plaintiff with a written agreement (the "Agreement") which provided that if Plaintiff waived all claims against Orleans County arising out of his employment, he would receive $17,500, a continuation of his health insurance coverage for six months, and a promise by Orleans County not to contest any claim for unemployment insurance.

Plaintiff saw the Agreement for the first time at his meeting with Ms. Tory and had only a few minutes to review it before he was asked to sign it. Ms. Troy stated that if Plaintiff did not sign the Agreement, Orleans County would withdraw its offer. Plaintiff signed the Agreement and received $17,500 from Orleans County.

In June 2016, Plaintiff deposited an unspecified amount in his attorney's IOLA account and continued to make deposits thereafter until the funds totaled more than $20,000. On March 17, 2017, Plaintiff wrote to Orleans County offering full repayment of the $17,500 paid to him pursuant to the Agreement. In a letter dated April 3, 2017, an attorney for Orleans County responded: "[w]e will not be providing you with the requested accounting, nor will we accept a tender back payment." *Id.* at 21, ¶ 106.

## III. Conclusions of Law and Analysis.

### A. Standard of Review.

Plaintiff moved for leave to amend his First Amended Complaint and to file the SAC while County Defendants' and CSEA Defendants' motions to dismiss were pending. Plaintiff states that he seeks to amend his pleading to make the following changes:

> (1) substitution of § 1981 as the basis for suit against Charles Nesbitt and Orleans Count[y], via a § 1983 claim; (2) certain assertions in the First Amended Complaint as to the corporate status of the Civil Service Employees Association Local 1000, and to further amplify upon the basis for the current causes of action pled against them; and (3) to add . . . Highway Superintendent Gray and Orleans County to the existing § 1981 claims via § 1983 asserted in the First Amended Complaint against Defendant CSEA.

(Doc. 19-2 at 7.) CSEA Defendants oppose Plaintiff's motion to amend for the reasons set forth in their motion to dismiss. County Defendants also oppose Plaintiff's motion to amend, incorporating the arguments made in their motion to dismiss and additionally contending that Mr. Nesbitt and Mr. Gray are entitled to qualified immunity with regard to Count V.

Pursuant to Fed. R. Civ. P. 15(a)(1), "[a] party may amend its pleading once as a matter of course within . . . 21 days after service of a responsive pleading or 21 days after

service of a motion under Rule 12(b), (e), or (f), whichever is earlier." If more than twenty-one days have elapsed, "a party may amend its pleading only with the opposing party's written consent or the court's leave[,]" but "[t]he court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2).

"When a plaintiff amends its complaint while a motion to dismiss is pending the court may deny the motion as moot or consider the merits of the motion in light of the amended complaint." *Illiano v. Mineola Union Free Sch. Dist.*, 585 F. Supp. 2d 341, 349 (E.D.N.Y. 2008) (citation and internal quotation marks omitted). In order to further the "just, speedy, and inexpensive determination" of this action, Fed. R. Civ. P. 1., the court considers Defendants' arguments for dismissal in light of the SAC. In this manner, it may determine whether the amendments would be futile and at the same time consider whether a claim should be dismissed.

"Leave to amend may properly be denied if the amendment would be futile, as when the proposed new pleading fails to state a claim on which relief can be granted." *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012) (internal citations omitted). The adequacy of an amended complaint "is to be judged by the same standards as those governing the adequacy of a filed pleading." *Ricciuti v. N.Y.C. Transit Auth.*, 941 F.2d 119, 123 (2d Cir. 1991).

To survive a motion to dismiss filed pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In other words, a plaintiff must allege sufficient facts to "nudge[] their claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

In reviewing a complaint under Rule 12(b)(6), a court is limited to the facts "contained within the four corners of the complaint[.]" *Goldberg v. Danaher*, 599 F.3d 181, 183 (2d Cir. 2010). However, a court may also review "any written instrument

attached to [the complaint] as an exhibit, any statements or documents incorporated in it by reference, and any document not incorporated but that is, nevertheless, integral to the complaint because the complaint relies heavily upon its terms and effect." *Yung v. Lee*, 432 F.3d 142, 146 (2d Cir. 2005) (citations and internal quotation marks omitted). The Agreement, an August 27, 2015 Equal Employment Opportunity Commission ("EEOC") Charge, and the Collective Bargaining Agreement are thus properly part of the record before the court as they are "integral to the complaint[.]" *Id.* To the extent there is a discrepancy between Plaintiff's allegations regarding the Agreement and the Agreement itself, the document prevails. *See Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 147 (2d Cir. 2011) (holding that "where a conclusory allegation in the complaint is contradicted by a document attached to the complaint, the document controls and the allegation is not accepted as true").

In their motion to dismiss, County Defendants argue that Plaintiff's claim of intentional discrimination under 42 U.S.C. § 1983 was untimely and that Mr. Nesbitt has no individual liability under Title VII. Because Plaintiff does not allege a claim under 42 U.S.C. § 1983 or Title VII against Mr. Nesbitt in the SAC, these requests for dismissal are DENIED AS MOOT.

**B. Whether Plaintiff Released County Defendants from Liability for All Claims.**

County Defendants argue that by signing the Agreement, Plaintiff released Orleans County and its agents and employees from all claims arising out of his employment. Plaintiff responds that the Agreement is unenforceable because he did not enter into it knowingly and voluntarily, or alternatively, that the Agreement is unenforceable because he executed it under duress.

"In enacting Title VII, Congress expressed a strong preference for encouraging voluntary settlement of employment discrimination claims." *Carson v. Am. Brands, Inc.*, 450 U.S. 79, 88 (1981). Notwithstanding this preference, a waiver of Title VII claims must still be "knowing[] and voluntar[y]." *Laniok v. Advisory Comm. of Brainerd Mfg. Co. Pension Plan*, 935 F.2d 1360, 1365 (2d Cir. 1991). The Second Circuit uses a

"totality of the circumstances test" to determine whether a release of Title VII claims meets the "knowing and voluntary" standard. *Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 438 (2d Cir. 1998). In making this determination, courts are directed to consider:

> 1) the plaintiff's education and business experience, 2) the amount of time the plaintiff had possession of or access to the agreement before signing it, 3) the role of plaintiff in deciding the terms of the agreement, 4) the clarity of the agreement, 5) whether the plaintiff was represented by or consulted with an attorney, and 6) whether the consideration given in exchange for the waiver exceeds employee benefits to which the employee was already entitled by contract or law. In addition, courts have considered a seventh factor—whether the employer encouraged the employee to consult an attorney and whether the employee had a fair opportunity to do so.

*Id.* (citing *Bormann v. AT & T Commc'ns*, 875 F.2d 399, 403 (2d Cir. 1989)).

Determining the validity of a release is a "peculiarly fact-sensitive inquiry[,]" *id.* at 437-38, and "none of the seven [*Bormann*] factors is individually dispositive." *Mandavia v. Columbia Univ.*, 912 F. Supp. 2d 119, 129 (S.D.N.Y. 2012). The analysis departs from ordinary contract principles, "imposing instead a more rigorous and subjective 'voluntariness' test in deference to the 'strong Congressional purpose . . . to eradicate discrimination in employment.'" *Kristoferson v. Otis Spunkmeyer, Inc.*, 965 F. Supp. 545, 548 (S.D.N.Y. 1997) (quoting *Bormann*, 875 F.2d at 403), *but see Davis v. Eastman Kodak Co.*, 2007 WL 952042, at *5 (W.D.N.Y. Mar. 29, 2007) ("Knowing and voluntary agreements to settle cases, including cases initiated under federal discrimination laws with broad remedial purposes like Title VII, are favored by courts and, once executed, should not be subject to easy invalidation.").

As set forth in the SAC, Plaintiff is a high school graduate who held various manual laborer positions until he was hired by Orleans County in 2006. At the time of his discharge from Orleans County, Plaintiff was employed as a Building Maintenance

Worker. Plaintiff's apparent lack of relevant business experience in negotiating a legally binding agreement weighs in favor of finding the Agreement unenforceable.[2]

Plaintiff alleges that he first saw the Agreement on February 9, 2015 and that he "had only minutes to review [it]" before he was asked to sign it. (Doc. 19-3 at 20, ¶ 103.) This *Bormann* factor also weighs in Plaintiff's favor. *See Mandavia*, 912 F. Supp. 2d at 130 (observing that "a decision of this magnitude may easily have required more than just an hour of reflection and evaluation to support a finding of knowing and voluntary release").

According to Plaintiff, he played no role in negotiating the terms of the Agreement. Although he ultimately obtained additional consideration based on inside information regarding the amount available for settlement, he did not negotiate any other terms of the Agreement. At best, this factor is in equipoise. *Compare Mandavia*, 912 F. Supp. 2d at 130 (observing that where plaintiff did not bargain for substantial benefits, a release may be found involuntary), *with Russomanno v. Murphy*, 2011 WL 609878, at *4 (S.D.N.Y. Feb. 16, 2011) (concluding that where plaintiff played "a significant role in deciding the terms of the agreement" through negotiating for higher severance pay, this factor weighed in favor of voluntariness).

With regard to the clarity of the Agreement, this *Bormann* factor weighs in favor of the County Defendants. The Agreement is written in non-technical language and is comprised of a two-page, fourteen-paragraph document. It clearly states in relevant part that:

> 11. In further consideration for the above, Mr. Phillips agrees to release the County, which shall discharge it, its legislators, elected officials, successors and assigns, agents, employees, managers, department heads and supervisors from any and all actions, suits or claims, including attorney's fees, against it arising out of the subject matter of Mr. Phillips' employment

---

[2] *Cf. Mandavia*, 912 F. Supp. 2d at 130 (finding a senior technician at a university had "significant education and business experience"); *Cordoba v. Beau Dietl & Assocs.*, 2003 WL 22902266, at *5 (S.D.N.Y. Dec. 8, 2003) (concluding that an employee with a high school diploma, one year of college, an associate business degree in accounting, and who worked in an accounting department for five years was capable of understanding a release).

with the County. This release specifically encompasses, but is not limited to, any and all claims of employment discrimination based on race, color, religion, sex and national origin, as provided under Title VII of the Civil Rights Act of 1964, as amended; all claims of employment discrimination based upon disability or handicap under state or federal law, including the Americans with Disabilities Act; as well as all claims of employment discrimination based on race, color, religion, disability, sex, national origin and age under the New York Executive Law, and any common law claims, including but not limited to any claims for breach of contract, wrongful discharge, negligence and *prima facie* tort.

12. Mr. Phillips acknowledges and agrees that the Union has fully and fairly represented him in the processing of the above-referenced grievance and in the negotiation of this agreement, and further agrees he will not sue or otherwise seek any relief against the Union for any cause that it has failed to perform its duty of fair representation to him.

13. Mr. Phillips represents and warrants that he has carefully read each and every provision of this agreement and that he fully understands all of the terms and conditions of this Agreement.

14. It is hereby expressly agreed and acknowledged that this Agreement contains the entire understanding of the parties in that there are no additional promises, representations, terms or provisions other tha[n] those contained herein. It may not be changed orally or without the express written consent of both parties.

(Doc. 14-2 at 2.) Because the terms of the Agreement are clear, concise, and written in plain language, this *Bormann* factor weighs in favor of finding the Agreement enforceable.

Prior to the signing of the Agreement on February 9, 2015, Plaintiff was not represented by an attorney, nor did he consult with one. Because Plaintiff claims that Ms. Troy was not adequately representing his interests and was acting as an agent of Orleans County, he contends that he effectively executed the Agreement without union representation as well. *See Mandavia*, 912 F. Supp. 2d at 131 (finding that where the plaintiff alleged that his union representative failed to adequately represent him, "it would be unreasonable to count [the union representation] against [p]laintiff"); *Okoro v. Marriott Int'l, Inc.*, 2007 WL 980429, at *2 (S.D.N.Y. Apr. 3, 2007) (finding that a determination that plaintiff's waiver was voluntary was inappropriate where the plaintiff

"dispute[d] the level of union involvement throughout the process"). He further contends that he repeatedly asked to consult with a lawyer and was told that if he did so, he would lose union representation and the settlement offer would be rescinded. These alleged facts weigh heavily in Plaintiff's favor.

With regard to the consideration provided in exchange for the waiver, Plaintiff received a lump sum payment of $17,500, six months of continued health care benefits, and a promise by Orleans County not to contest his claim for unemployment insurance. These are benefits to which Plaintiff was not otherwise entitled. This factor thus weighs in favor of finding the Agreement enforceable. *See Laramee v. Jewish Guild for Blind*, 72 F. Supp. 2d 357, 361 (S.D.N.Y. 1999) (finding that severance pay and an additional year of health coverage constituted consideration for a waiver and supported a finding that the waiver was valid). These facts weigh in favor of the Agreement's enforceability.

With regard to the final *Bormann* factor, courts are directed to consider "whether the employer encouraged the employee to consult an attorney and whether the employee had a fair opportunity to do so." *Livingston*, 141 F.3d at 438 (citing *Bormann*, 875 F.2d at 403). Plaintiff alleges that three days passed between when CSEA verbally presented Orleans County's $17,500 offer and when he was asked to sign the Agreement. He was not represented by an attorney in negotiating the Agreement, was not advised to consult one, and did not do so. He was asked to sign the Agreement on the day it was presented to him. These facts weigh heavily in Plaintiff's favor. *Compare Mandavia*, 912 F. Supp. 2d at 132 (holding that where an employee's only guidance came from a non-attorney union representative and the release did not explicitly encourage the employee to meet with an attorney, this factor weighs in favor of invalidating the release), *with Kramer v. Vendome Grp. LLC*, 2012 WL 4841310, at *4-5 (S.D.N.Y. Oct. 4, 2012) (holding that where the release explicitly encouraged the plaintiff to discuss the terms with an attorney, this factor weighed in favor of finding the release valid).

Accepting Plaintiff's factual allegations as true, four of the *Bormann* factors support Plaintiff's argument that the Agreement was not executed knowingly and voluntarily, two of the factors support a contrary finding, and one factor is neutral.

12

Because Plaintiff's claim that the Agreement was not executed knowingly and voluntarily is "plausible[,]" dismissal is not warranted at the pleading stage. *Iqbal*, 556 U.S. at 678; *see also Mandavia*, 912 F. Supp. 2d at 132 (holding that a plaintiff plausibly alleged that a waiver was not executed knowingly and voluntarily upon finding that four of the *Bormann* factors supported the plaintiff's argument, two factors supported the defendant's argument, and one factor was neutral).

Plaintiff alternatively argues that the Agreement is void because it was obtained under duress. "To void a contract on the ground of economic duress, the complaining party must show that its agreement was procured by means of (1) a wrongful threat that (2) precluded the exercise of its free will." *Interpharm, Inc. v. Wells Fargo Bank, Nat. Ass'n*, 655 F.3d 136, 142 (2d Cir. 2011). The wrongful threat "must emanate from the party who is attempting to obtain the agreement." *Mazurkiewicz v. New York City Health & Hosps. Corp.*, 585 F. Supp. 2d 491, 500 (S.D.N.Y. 2008), *aff'd*, 356 F. App'x 521 (2d Cir. 2009). "Because an element of economic duress is . . . present when many contracts are formed or releases given, the ability of a party to disown his obligations under a contract or release on that basis is reserved for extreme and extraordinary cases." *VKK Corp. v. Nat'l Football League*, 244 F.3d 114, 123 (2d Cir. 2001).

Plaintiff alleges that he signed the Agreement because he felt intimidated by the "take it or leave it" offer conveyed to him by Ms. Troy. (Doc. 19-3 at 20, ¶ 100.) As Ms. Troy was employed by CSEA, not Orleans County, it is questionable whether Orleans County can be deemed responsible for her conduct. *See Mandavia*, 912 F. Supp. 2d at 128 (holding that plaintiff could not escape a liability waiver by invoking duress where the alleged duress was caused by a union representative rather than the defendant employer); *Evans v. Waldorf-Astoria Corp.*, 827 F. Supp. 911, 914 (E.D.N.Y. 1993), *aff'd*, 33 F.3d 49 (2d Cir. 1994) (holding that "[d]uress by [someone] other than the opposing party to a contract cannot constitute compulsion sufficient to void the contract"). Without more, Plaintiff has not plausibly alleged duress. This conclusion is underscored by the absence of allegations that the County Defendants took advantage of his necessitous circumstances or exploited his vulnerability. *See Interpharm, Inc.*, 655

F.3d at 142 ("[A] mere demonstration of financial pressure or unequal bargaining power will not, by itself, establish economic duress.").

County Defendants argue that regardless of the circumstances surrounding the Agreement's execution, "Plaintiff ratified the release when he made the decision to keep the consideration." (Doc. 20 at 11.) They further contend that Plaintiff's offer to tender back the $17,500 payment on March 17, 2017 was not a valid repudiation of the Agreement because Plaintiff discovered that the Agreement was voidable in August 2015, but chose to retain the benefits for approximately a year and a half thereafter.

The Second Circuit has held that:

> It is a generally accepted principle that a voidable contract can be cured by ratification through express or implied conduct, but that a person charged with ratification of such a contract must have acted voluntarily and with full knowledge of the facts. Moreover, a party asserting the defense of ratification of a voidable contract ordinarily must demonstrate that the releasor intended to ratify the agreement. . . . With respect to ratification of a release by conduct, the test is whether the releasor, with full knowledge of the material facts entitling him to rescind, has engaged in some unequivocal conduct giving rise to a reasonable inference that he intended the conduct to amount to a ratification.

*Brown v. City of S. Burlington, Vt.*, 393 F.3d 337, 343-44 (2d Cir. 2004) (citations and internal quotation marks omitted).

Plaintiff asserts that he first met with an attorney regarding his employment concerns on August 19, 2015, at which time he learned of his right to repudiate the Agreement. He filed an EEOC charge on August 27, 2015, and in June 2016, he began to deposit funds in his attorney's IOLA account until those funds totaled more than $20,000. On March 17, 2017, Plaintiff attempted to tender back the $17,500 paid to him under the Agreement; Orleans County declined this offer.

Whether ratification occurred is generally a question of fact. *See id.* (noting that "[w]hether the return [of consideration] was timely is ordinarily a question of fact") (citing 66 Am. Jur. 2d Release § 46 (2001)); *Kovian v. Fulton Cty. Nat'l Bank & Tr. Co.*, 857 F. Supp. 1032, 1040 (N.D.N.Y. 1994) (holding that because there existed "a question

of material fact concerning the issue of plaintiffs' intent to ratify the release[,]" the court could not determine whether the release was void on a motion for summary judgment).

Because the court cannot make a determination of ratification as a matter of law based on the SAC's allegations, dismissal is not appropriate at this juncture. The court therefore DENIES County Defendants' motion to dismiss all claims against them on the grounds that Plaintiff ratified the Agreement.

### C. Whether Count IV Alleging Interference with the Right to Contract Should be Dismissed.

Count IV alleges that CSEA Defendants unlawfully interfered with Plaintiff's right to make and enforce contracts in violation of 42 U.S.C. § 1981. CSEA Defendants assert that although Plaintiff "frames" this cause of action as a claim under Section 1981, it "constitutes a duty of fair representation claim under state law." (Doc. 15-2 at 12.) On this basis, CSEA Defendants argue that a duty of fair representation claim is barred by the applicable four-month statute of limitations and this court lacks subject matter jurisdiction to adjudicate it. Even if it is deemed a Section 1981 claim, CSEA Defendants contend that it remains barred by a three-year statute of limitations and that it fails to plausibly state a claim for relief.

"All persons" are guaranteed the "same right . . . to make and enforce contracts . . . as is enjoyed by white citizens[.]" 42 U.S.C. § 1981(a). "To establish a claim under 42 U.S.C. § 1981, plaintiffs must allege facts supporting the following elements: (1) plaintiffs are members of a racial minority; (2) defendants' intent to discriminate on the basis of race; and (3) discrimination concerning one of [§ 1981's] enumerated activities." *Brown v. City of Oneonta, N.Y.*, 221 F.3d 329, 339 (2d Cir. 2000). These enumerated activities include "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). Section 1981 "can be violated only by intentional discrimination[.]" *Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375, 391 (1982).

CSEA Defendants argue that Plaintiff fails to state a plausible claim under Section 1981 because he fails to allege facts indicating that representatives of CSEA Local 1000 acted with discriminatory intent. "A union which intentionally avoids asserting discrimination claims . . . is liable under . . . § 1981, regardless of whether, as a subjective matter, its leaders were favorably disposed toward minorities." *Goodman v. Lukens Steel Co.*, 482 U.S. 656, 669 (1987) (citation omitted). Plaintiff alleges that CSEA Defendants discriminated against him by refusing to grieve his unlawful termination, refusing to investigate whether he was terminated for discriminatory reasons, refusing to arbitrate his termination, and encouraging him to accept an inadequate settlement offer. He further alleges that he was deprived of effective representation in negotiating the Agreement and discouraged from reporting harassment by fellow CSEA Local 1000 members. These allegations plausibly support Plaintiff's claim that the "[u]nion[] deliberately chose not to assert claims of racial discrimination by the employer" in violation of Section 1981. *Id.* at 667; *see also Woods v. Graphic Commc'ns*, 925 F.2d 1195, 1203 (9th Cir. 1991) (holding that where a "[u]nion systematically failed to file a grievance on behalf of [the plaintiff] concerning the racial atmosphere in the [workplace,] . . . [s]uch a failure may constitute a violation of § 1981"). Section 1981 encompasses claims of retaliation. *See CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 457 (2008) ("We consequently hold that 42 U.S.C. § 1981 encompasses claims of retaliation."). Whether these same allegations plausibly also allege a violation of the duty of fair representation is irrelevant. Plaintiff, as "the master of the complaint," *Holmes Grp., Inc. v. Vornado Air Circulation Sys., Inc.*, 535 U.S. 826, 831, (2002), may decide the theory on which he proceeds and CSEA Defendants are not entitled to recharacterize it.

CSEA Defendants' alternative argument that Plaintiff's Section 1981 claim is untimely because it barred by a three-year statute of limitations is also without merit. A Section 1981 claim "is subject to the four-year federal statute of limitations in 28 U.S.C. § 1658" where the claim is "made possible by post-1990 amendments to § 1981." *Brown v. Castleton State Coll.*, 663 F. Supp. 2d 392, 396 (D. Vt. 2009) (internal quotation marks omitted); *see also Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 382 (2004) ("We

conclude that a cause of action 'aris[es] under an Act of Congress enacted' after December 1, 1990—and therefore is governed by § 1658's 4–year statute of limitations—if the plaintiff's claim against the defendant was made possible by a post–1990 enactment."). The 1991 amendments to Section 1981 expanded the right to make and enforce contracts to include "racially discriminatory acts occurring after a contract was formed." *Brown*, 663 F. Supp. 2d at 397.

Plaintiff filed his Complaint on July 9, 2018. As a result, any injuries he suffered on or after July 9, 2014 are within the four-year limitations period. Plaintiff alleges that CSEA Local 1000 refused to investigate and arbitrate his retaliation claim in January and February of 2015. Plaintiff's claim is thus not untimely because at least one act alleged is not barred by the applicable statute of limitations.[3] Because Plaintiff has asserted facts which "plausibly give rise to an entitlement to relief[,]" *Iqbal*, 556 U.S. at 679, CSEA Defendants' motion to dismiss Count IV is DENIED.

### D. Whether Mr. Nesbitt and Mr. Gray are Entitled to Qualified Immunity for Plaintiff's Section 1981 Claim (Count V).

County Defendants contend that Mr. Nesbitt and Mr. Gray are entitled to qualified immunity because Plaintiff fails to allege that they violated clearly established law. "Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards*, 566 U.S. 658, 664 (2012). A right is sufficiently clear when "every reasonable official would have understood that what he is doing violates that right." *Id.* (internal quotation marks and alteration omitted). Supreme Court precedent "does not require a case directly on point for a right to be clearly established, [however] existing precedent must have placed the statutory or constitutional question beyond debate." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (per curiam) (citation and internal quotation marks omitted).

---

[3] Evidence of time-barred events may further be considered as background to Plaintiff's timely claims. *See Fitzgerald v. Henderson*, 251 F.3d 345, 365 (2d Cir. 2001) ("A statute of limitations does not operate to bar the introduction of evidence that predates the commencement of the limitations period but that is relevant to events during the period.").

"There can be no doubt that the law barring discrimination against a person on the basis of race . . . is 'well-settled.'" *Hill v. Taconic Developmental Disabilities Servs. Office*, 283 F. Supp. 2d 955, 958 (S.D.N.Y. 2003), *aff'd sub nom. Hill v. Taconic Dev. Disabilities Servs. Office*, 82 F. App'x 254 (2d Cir. 2003). Where a plaintiff plausibly alleges that he was the victim of prohibited discrimination by a particular defendant, "it seems logically impossible that [the defendant] could be entitled to qualified immunity *as a matter of law*[.]" *Id.* (emphasis in original).

Plaintiff claims that Mr. Gray failed to respond to complaints of racial harassment, told Plaintiff that he would "pay the price" after he reported racial harassment to Mr. Nesbitt, and terminated Plaintiff in retaliation for making those reports. Plaintiff further alleges that Mr. Nesbitt failed to adequately respond to complaints of racial harassment, ordered Mr. Cliff to retaliate against Plaintiff for complaining about racial harassment, and was involved in the decision to terminate Plaintiff in retaliation for reporting harassment. These allegations plausibly allege that it was not "objectively reasonable" for Mr. Gray and Mr. Nesbitt to believe that their acts and omissions were lawful. *Kisela*, 138 S. Ct. at 1156 (holding that a claim of qualified immunity depends on "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them") (citation omitted).

Because the laws prohibiting racial discrimination and retaliation for reporting such discrimination were clearly established at the time of the alleged violations, and because Plaintiff plausibly alleges that Mr. Gray and Mr. Nesbitt violated them, County Defendants' motion to dismiss Count V on the basis of qualified immunity is DENIED. *See Walker v. Schult*, 717 F.3d 119, 130 (2d Cir. 2013) (directing that, although "qualified immunity should be decided as early as possible in a case," it can be "premature" to grant dismissal because qualified immunity is "best decided" on a motion for summary judgment when the facts are "more fully developed").

### E.   Whether Count VI Fails to State a Claim upon Which Relief may be Granted.

County Defendants argue that Plaintiff's ADEA claim (Count VI) is subject to dismissal because he failed to exhaust his administrative remedies by failing to file an EEOC charge alleging age discrimination. "Exhaustion of administrative remedies through the EEOC is 'an essential element' of the Title VII and ADEA statutory schemes and, as such, a precondition to bringing such claims in federal court." *Legnani v. Alitalia Linee Aeree Italiane, S.P.A.*, 274 F.3d 683, 686 (2d Cir. 2001) (quoting *Francis v. City of New York*, 235 F.3d 763, 768 (2d Cir. 2000)).

"[A] plaintiff typically may raise in a district court complaint only those claims that either were included in or are 'reasonably related to' the allegations contained in her EEOC charge." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 83 (2d Cir. 2001) (quoting *Butts v. City of New York Dep't of Hous. Pres. & Dev.*, 990 F.2d 1397, 1401 (2d Cir. 1993)). "[C]laims that introduce a wholly different type of discrimination from that in the administrative charge are typically deemed to be not reasonably related." *Jennings v. Suny Health Sci. Ctr. at Brooklyn (Downstate Med. Ctr.)*, 201 F. Supp. 3d 332, 336 (E.D.N.Y. 2016) (citation omitted).

Plaintiff filed a complaint with the EEOC on or about August 27, 2015 in which he stated: "I was the victim of illegal employment discrimination based on race and age. I hereby charge [Orleans County] . . . with unlawful employment discrimination including Race, Age, and Retaliation" and "I charge Orleans County . . . with violations of Title VII, of the Civil Rights Act of 1964, as well as the Age Discrimination in Employment Act including the Older Worker[]s Benefit and Protection Act." (Doc. 26-1 at 3, 7.) As County Defendants point out, the factual allegations in Plaintiff's EEOC charge do not explain the basis for Plaintiff's age discrimination claim beyond stating that Plaintiff's Caucasian co-worker allegedly received more favorable treatment.

"[I]t is well-settled that merely checking a box, or failing to check a box [on the EEOC charge form] does not necessarily control the scope of the charge." *Cooper v. Xerox Corp.*, 994 F. Supp. 429, 436 (W.D.N.Y. 1998). Nonetheless, the key question in

determining whether claims are "reasonably related" to the EEOC charge is whether "the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *Collins v. City of New York*, 156 F. Supp. 3d 448, 455 (S.D.N.Y. 2016) (citation and internal quotation marks omitted). On June 17, 2018, the EEOC issued a notice of Plaintiff's right to sue under Title VII and the ADEA, which indicates that age discrimination claims were within the scope of its investigation. Because Plaintiff alleged that he experienced discrimination on the basis of age and this claim is reasonably related to the events described in his EEOC charge, Plaintiff did not fail to exhaust his administrative remedies with regard to his age discrimination claim.[4]

County Defendants alternatively contend that, even if Plaintiff exhausted his administrative remedies, he fails to state a claim for age discrimination in violation of the ADEA. In making this argument, they characterize Plaintiff's age discrimination claim as based on a violation of the Older Workers Benefit Protection Act ("OWBPA") because the Agreement fails to inform Plaintiff of: (1) his right to a twenty-one-day review period prior to signing, (2) his right to a seven-day revocation period, and (3) the right to have an attorney review the Agreement prior to signing it. As County Defendants point out, a violation of OWBPA is "not a proper basis for a separate cause of action." *Kourofsky v. Genencor Int'l, Inc.*, 459 F. Supp. 2d 206, 215 (W.D.N.Y. 2006). Had Plaintiff limited his ADEA claim to a violation of OWBPA, County Defendants would prevail. However, because the SAC contains additional, albeit relatively scant, ADEA-related allegations, this argument does not provide grounds for dismissal.

The ADEA makes it "unlawful for an employer . . . to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age[.]" 29 U.S.C. § 623(a). To set forth a *prima facie* case of age

---

[4] In *Fort Bend Cty., Tex. v. Davis*, 139 S. Ct. 1843, 1850 (U.S. June 3, 2019) the Supreme Court held that "Title VII's charge-filing requirement is not . . . jurisdictional[.]"

discrimination, Plaintiff must allege that: "1) he was within the protected age group; 2) he was qualified for the position; 3) he was subject to an adverse employment action; and 4) the adverse action occurred under circumstances giving rise to an inference of discrimination." *Terry v. Ashcroft*, 336 F.3d 128, 137-38 (2d Cir. 2003) (internal quotation marks omitted). "The burden of establishing a *prima facie* case is not a heavy one." *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 134 (2d Cir. 2000).

In the SAC, Plaintiff plausibly alleges the first three prongs of a *prima facie* case of age discrimination under the ADEA. He states: "Defendants engaged in disparate discipline and discharge of [P]laintiff, by disciplining his younger, Caucasian co-worker, Scott Dugan at a far less serious level than Plaintiff [] who is significantly older." (Doc. 19-3 at 35-36, ¶ 167.) Plaintiff was within the protected age group, he was qualified for his position and even recognized as an exemplary employee, and he was discharged for a relatively minor infraction and a single use of profanity which he denies. The only remaining question is whether the circumstances of Plaintiff's termination plausibly give rise to an inference of discrimination. "A disparate treatment claim can be established by showing that an employer treated plaintiff less favorably than a similarly situated employee outside his protected group." *Dickens v. Hudson Sheraton Corp., LLC*, 167 F. Supp. 3d 499, 520 (S.D.N.Y. 2016), *aff'd*, 689 F. App'x 670 (2d Cir. 2017) (citation and internal quotation marks omitted). Where disparate treatment is claimed, a plaintiff must plausibly allege he was "similarly situated in all material respects" to the comparator employee and that "the conduct for which the employer imposed discipline was of comparable seriousness." *Graham v. Long Island R.R.*, 230 F.3d 34, 39-40 (2d Cir. 2000). "Whether two employees are similarly situated ordinarily presents a question of fact for the jury." *Id.* at 39.

County Defendants contend that although Plaintiff was subjected to harsher discipline than his younger co-worker, Plaintiff and Mr. Dugan were not similarly situated because, "unlike Plaintiff, [Mr. Dugan] did not hurl profanity at his supervisor[.]" (Doc. 20 at 5.) However, Plaintiff denies that he swore at his supervisor and asserts that "[Mr.] Dugan, a younger, Caucasian male, was issued a short suspension

21

based on similar allegations resulting in Plaintiff's termination[.]" (Doc. 19-3 at 17.) At the pleading stage, the court does not resolve factual disputes. *See Iqbal*, 556 U.S. at 678 (noting that "for the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true"). Plaintiff's allegations in the SAC are therefore sufficient to plausibly allege an inference of age discrimination in light of the not "heavy" burden of establishing a *prima facie* case. *Carlton*, 202 F.3d at 134; *see also Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 108 (2d Cir. 2010) (holding that "the fact that other younger employees were not disciplined for violating numerous policies is . . . *prima facie* evidence of discrimination"); *Glenwright v. Xerox Corp.*, 832 F. Supp. 2d 268, 274 (W.D.N.Y. 2011) (holding that "the more favorable treatment of employees not in the protected group" is one of the circumstances that "may give rise to an inference of discrimination" under the ADEA).

For the foregoing reasons, the court DENIES County Defendants' motion to dismiss Plaintiff's claim of age discrimination in violation of the ADEA (Count VI).

## CONCLUSION

For the foregoing reasons, Plaintiff's motion to amend his complaint is GRANTED. (Doc. 19.) County Defendants' motion to dismiss is DENIED. (Doc. 14.) CSEA Defendants' motion to dismiss is DENIED. (Doc. 15.)

SO ORDERED.

Dated this 15th day of July, 2019.

_____
Christina Reiss, District Judge
United States District Court